# 26-1904

## UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

KYUNG L. TROTTER,

*Plaintiff-Appellant*,

v.

COMMUNITY DEVELOPMENT CORPORATION OF LONG ISLAND,

SEVEN TIER, LP, JOHN MANGINO, and THOMAS ZAWYRUCHA,

*Defendants, Appellees*.

On Appeal from the United States District Court

for the Eastern District of New York

## BRIEF OF PLAINTIFF-APPELLANT KYUNG L. TROTTER

Kyung L. Trotter
Pro Se Appellant
374 Donald Blvd
Holbrook, NY 11741
(631) 202-7887

Dated: October 20, 2026

# TABLE OF CONTENTS

**JURISDICTIONAL STATEMENT** .......... 7

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW** .......... 8

**STATEMENT OF THE CASE** .......... 9

**SUMMARY OF THE ARGUMENT** .......... 14

**ARGUMENT** .......... 16

I. The Court Erred in Applying a Local Inversion of 28 U.S.C. § 2283 and the Younger Abstention .......... 16

A. The Inversion of 28 U.S.C. § 2283 and Misapplication of the Younger Abstention .......... 16

B. The Erroneous Reinterpretation of the Anti-Injunction Act .......... 30

II. The District Court Erred in Refusing to Exercise its Jurisdiction Over Trotter's Motions for Temporary Restraining Orders and Preliminary Injunction .......... 37

A. Trotter Showed a Likelihood of Success On the Merits of Her Claims ... 40

B. Trotter Raised Six Questions Going to the Merits of Her Claims .......... 42

III. The Court Erred in Not Issuing a Written Order Containing Findings of Facts and Conclusions of Law under Fed. R. Civ. P. 52(a)(2) .......... 46

IV. The District Court Erred in Not Setting Out DE 2 and DE 29 on Separate Documents .......... 48

V. The District Court Erred in *Sua Sponte* Denying Trotter's Motions for TROs and PIs, Altering the Procedural Playing Field in Defendants' Favor ..............49

A. Trotter's Civil-Rights Complaint and Supported Emergency Applications Required Meaningful Consideration ..........................................................49

B. The Court's Refusal Stripped Trotter of the Opportunity to Secure the Tactical Advantage of a Favorable Merits Determination ............................52

C. The Court Supplied a Procedural Shield for Defendants Who Had Not Opposed the Application .........................................................................53

D. The June 17 Denial Entrenched the Same Procedural Disadvantage as the Emergency Became More Urgent ...............................................................54

E. The Refusal Undermined the Preventive Function of the Federal Civil-Rights Remedy.............................................................................................55

F. Vacatur Is Necessary to Remedy the Procedural Error and Restore Fair Adjudication ............................................................................................56

VI. CDCLI Lacks Standing to Litigate the Injunction Controversy ..................56

CONCLUSION ..................................................................................................58

ADDENDUM (Text of 24 C.F.R. § 982.310) .......................................................60

# TABLE OF AUTHORITIES

## CASES

*Abbatiello v. Wells Fargo Bank, N.A.*, No. 15 Civ. 4210, 2015 WL 5884797 (E.D.N.Y. Oct. 8, 2015) ........................................................................20

*Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281 (1970) ........................................................................31

*Billie v. Aurigremma*, No. 13-CV-1432, 2014 WL 1117860 (D. Conn. Mar. 19, 2014) ........................................................................26, 27, 33,

*Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77 (2d Cir. 2018) ............50

*Clark v. Bloomberg*, No. 10 Civ. 1263, 2010 WL 1438803 (E.D.N.Y. Apr. 12, 2010) ........................................................................20

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) ........................................................................22, 38

*Day v. McDonough*, 547 U.S. 198 (2006) ..................................................50

*Diamond "D" Construction Corp. v. McGowan*, 282 F.3d 191 (2d Cir. 2002)57

*Doe v. St. Joseph's Hospital of Ft. Wayne*, 788 F.2d 411 (7th Cir. 1986).........51

*Ethridge v. Bell*, 49 F.4th 674 (2d Cir. 2022) ..............................................51

*Ex parte Virginia*, 100 U.S. 339 (1879)......................................................32

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ..................................................10, 40

*Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) ........................................21, 23

*Keir v. Schoeberl*, No. 25-CV-0056, 2025 WL 437953 (N.D.N.Y. Feb. 7, 2025) ........................................................................................24, 25, 33

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ...............................41, 51

*Lugo v. Keane*, 15 F.3d 29 (2d Cir. 1994).......................................................50

*Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310 (1940)................46, 48

*McClellan v. Carland*, 217 U.S. 268 (1910).....................................................22

*Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010) ..........................................................................................................40

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) ........................................................................................22, 23, 27

*Mitchum v. Foster*, 407 U.S. 225 (1972) ....................... 13, 17, 18, 30, 32, 36, 37

*Moore v. Sims*, 442 U.S. 415 (1979)................................................................23

*New Orleans Public Service, Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350 (1989).........................................................................21

*Ochei v. Lapes*, No. 19-CV-3700, 2020 WL 528705 (S.D.N.Y. Jan. 31, 2020)..30

*Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986)...........................................................................................................23

*Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1 (1987)................................................21

*Perez v. Ortiz*, 849 F.2d 793 (2d Cir. 1988)................................................51, 53

*Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923)...........................................26, 33

*Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307 (E.D.N.Y. 2012) ..........12, 34, 35, 36, 37

*Sinkler v. Berryhill*, 932 F.3d 83 (2d Cir. 2019) ..........35, 36

*Smith v. Rocket Mortg. LLC*, No. 25-CV-6468, 2025 WL 3300146 (W.D.N.Y. Sept. 11, 2025) ..........21, 22, 25, 26

*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69 (2013) ..........11, 16, 17, 18, 19, 23, 29, 33

*Trainor v. Hernandez*, 431 U.S. 434 (1977) ..........23

*Umeze v. Johnson*, No. 25-CV-5610, 2025 WL 2644628 (S.D.N.Y. Sept. 15, 2025) .......... 19, 20, 21, 22, 23, 24, 26, 27

*Virtue v. HB1 Alternative Holdings, LLC*, No. 25-CV-6345, 2026 WL 851377 (S.D.N.Y. Mar. 27, 2026) ..........24, 25

*Watkins v. Ceasar*, 88 F. App'x 458 (2d Cir. 2004) ..........31, 32, 35

*Wyly v. Weiss*, 697 F.3d 131 (2d Cir. 2012)..........45

*Zervos v. Verizon New York, Inc.*, 252 F.3d 163 (2d Cir. 2001)..........45

**STATUTES**

28 U.S.C. § 1292(a)(1)..........7

28 U.S.C. § 1331..........7

28 U.S.C. § 1343(3)..........7

28 U.S.C. § 2107(a)..........7

28 U.S.C. § 2283 (Anti-Injunction Act) .................................................. *passim*

42 U.S.C. § 1437f ..........................................................................7, 9, 10, 38, 42

42 U.S.C. § 1983 ..........................................................................................*passim*

**RULES & REGULATIONS**

24 C.F.R. § 982 ..........................................................................................7, 38, 42

24 C.F.R. § 982.310 ...........................................................................................9, 42

24 C.F.R. § 982.555 .........................................................................................10, 41

Fed. R. App. P. 3(c)(1)(B), (4), (6).................................................................44

Fed. R. App. P. 4(a)(7)(ii)..................................................................................7

Fed. R. App. P. 4(a)(7)(B) .................................................................................8

Fed. R. App. P. 4(a)(2), (7).................................................................................8

Fed. R. Civ. P. 52(a)(2)...................................................................................8, 46

Fed. R. Civ. P. 54(a) ........................................................................................48

Fed. R. Civ. P. 58(a) ........................................................................................48

## JURISDICTIONAL STATEMENT

The District Court has subject-matter jurisdiction under 28 U.S.C. § 1343(3) (civil rights) and 28 U.S.C. § 1331 (federal question), as Plaintiff alleges deprivation of rights secured by the Constitution, federal statute and regulation (42 U.S.C. § 1983; 42 U.S.C. § 1437f and implementing regulation 24 CFR §982).

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review both the April 22nd and June 17, 2026 orders denying Trotter's emergency requests for preliminary injunction.

Pursuant to Fed. R. Civ. P. 58(a), the District Court was required to enter a written appealable order by setting the same out on a separate document. When the District Court fails to do so, entry is not deemed legal until 150 days after entry on the civil docket. Fed. R. App. P. 4(a)(7)(ii). Here, the District Court entered docket-only orders on both dates. Under the aforementioned rules, Trotter's appeal is timely. Specifically, for the April 22, 2026 order, the 150-day mark fell on September 19, 2026, resulting in a 30-day window under 28 U.S.C. § 2107(a) extending the filing deadline to October 19, 2026. Under the same mechanism, the 150-day period for the June 17, 2026 order runs to November 14, 2026, resulting in a deadline of December 14, 2026.

A failure to set forth a judgment or order on a separate document when required by Federal Rule of Civil Procedure 58(a) does not affect the validity of an appeal from that judgment or order. Fed. R. App. P. 4(a)(7)(B).

A notice of appeal filed after the court announces a decision or order but before the entry of the judgment or order, is treated as filed on the date of and after the entry. Fed. R. App. P. 4(a)(2). Consequently, although the District Court failed to enter separate documents on both dates, Trotter's appeal is entirely timely.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**I**. The District Court Erred in Applying a Local Inversion of 28 U.S.C. § 2283 and the Younger Abstention

**II.** The District Court Erred in Refusing to Exercise its Jurisdiction Over Trotter's Motions for Temporary Restraining Orders and Preliminary Injunction

**III.** The Court Erred in Not Issuing a Written Order Containing Findings of Facts and Conclusions of Law under Fed. R. Civ. P. 52(a)(2)

**IV.** The District Court Erred in Not Setting Out its June 17 and April 22, 2026 denials of Trotter's Motions for Preliminary Injunction on Separate Documents

**V.** The District Court Erred in *Sua Sponte* Denying Trotter's Motions for TROs and PIs, Altering the Procedural Playing Field in Defendants' Favor

## STATEMENT OF THE CASE

Trotter is a Housing Choice Voucher (HCV) recipient governed under 42 U.S.C. § 1437f and implemented under 24 CFR 982. As a participant in this program, she is entitled to continued tenancy, which is secured by mandatory written lease renewals, coterminous Housing Assistance Payments (HAP) contracts, and Tenancy Addendums (TA). The Tenancy Addendum informs the HCV tenant of her rights and is enforceable against the participating landlord. So long as this tripartite, statutory and regulatory framework is in place, a landlord may not terminate the tenancy without first serving notice of grounds for "good cause" pursuant to 42 U.S.C. § 1437f(d)(1)(B)(iv), (o)(7)(C) and 24 C.F.R. § 982.310(e)(2)(i). Neither may the landlord file a petition without pleading the same good cause nor may it obtain a judgment of eviction without having proven said good cause. The statute and regulation state: “during the term of the lease, the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause.”

The Community Development Corporation of Long Island (CDCLI), the delegated local Housing Authority administering vouchers in Suffolk County, created and maintains a custom or policy which deprives tenants of their legitimate entitlements under this framework. Specifically, CDCLI declares that upon the

expiration of an initial one-year written lease term, tenants "automatically" convert to an implied "month-to-month" tenancy, rather than retaining the written lease framework, stripping them of good cause due process protections available only "during the term of the lease". This places the HCV tenant into a status as if CDCLI has terminated their voucher and they have been removed from the program. In other words, the tenant appears to be a “market rate”, unsubsidized tenant, without CDCLI having to hold a termination hearing under 24 C.F.R. § 982.555. *Goldberg v. Kelly*, 397 U.S. 254, 261-262 (1970). This transforms the tenant from a person with housing security, to a dispensable source of income. CDCLI may continue to collect fees from the U.S. Department of Housing and Urban Development (HUD) for each voucher that it administers. The landlord continues to collect rent from CDCLI and the tenant. In the meantime, the tenant can be evicted at the landlord's will, without having to serve predicate notice informing the tenant of its grounds for good cause to terminate the tenancy, or having to prove the same in court, before securing a warrant of eviction. The landlord need only serve notice claiming that the tenant is a month-to-month holdover entitled only to the due process required under state law, instead of the mandatory Federal due process provided under 42 U.S.C. § 1437f(d)(1)(B)(iv), (o)(7)(C) and 24 C.F.R. § 982.310(e)(2)(i).

Landlords Seven Tier, LP (Seven Tier) and John Mangino (Mangino) utilized this custom to collect HAP payments while evading said mandatory good cause. Seven Tier practiced this custom in 2018, 2020, 2021, and 2022 before serving a 90-day termination upon Trotter, merely claiming that she was a "month to month holdover". It then filed a petition pleading with the same falsity.

Mangino practiced it in 2024, 2025, and 2026, serving the same state standard only termination notice, just like Seven Tier, alleging zero grounds for federal good cause in November 2025. It then filed a summary eviction petition pleading no grounds for good cause, on or about December 1, 2025.

Without CDCLI's policy or custom of "automatic month to month" tenancy, these unconstitutional evictions would not be possible.

Trotter made her first appearance in the eviction proceedings on February 5, 2026. She filed a Motion to Dismiss, asserting that she had a due process right to notice stating Mangino's grounds for federal good cause and that he also failed to plead her HCV status in his petition, further evading the mandatory showing of good cause and failing to state a claim under RPAPL § 741.

From there, Defendant Zawyrucha, Mangino's attorney at the time, began his bad faith campaign to ensure that Trotter would not be heard by the State Court, (See A-19-20) and indeed she was not. Trotter filed at least 8 pleadings complaining to the court about Defendant Zawyrucha's underhanded tactics and

asking for correction of the procedural advantage, which Mangino had gained due to these tactics. The Court answered none of these pleadings.

Subsequently, on April 21, 2026, Trotter filed her first Section 1983 complaint in the district court, and first Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, to enjoin the unconstitutional state court eviction proceedings. She attached a sworn affidavit and argued the legal elements of a preliminary injunction, while establishing that her circumstances were analogous to *Sinisgallo v. Town of Islip Hous. Authority*, 865 F. Supp. 2d 307, 317 (E.D.N.Y. 2012). (A-9). Despite Defendant Zawyrucha and Mangino failing to appear or contest the motion, the District Court, *sua sponte*, denied relief on April 22, 2026, via a text-only docket entry, containing zero findings of fact or conclusions of law. (See A- 2). The court recited the injunction elements, skipped over applying them to Trotter's sworn facts, and invoked a phantom "ongoing state court" bar to its jurisdiction, purportedly pursuant to *Younger v. Harris*, 401 U.S. 37 (1971) and the Anti-Injunction Act (AIA).

On April 30, 2026, Trotter filed her Amended Complaint adding Zawyrucha as a defendant, detailing his bad-faith tactics, *ex parte* communications, and deployment of the defective termination notice.

On April 17, 2026, the State Court collapsed all of Trotter's unanswered pleadings- including her motion to dismiss asserting her right to good cause- into a

single page, barely one paragraph denial, containing no reasoning whatsoever. (See A- 56). The Court then declared that the case was ready for trial and scheduled the same for June 18, 2026.

Following Mangino's default in the district court, Trotter secured a Certificate of Default on June 8. On June 10, the District Court, *sua sponte*, restricted Trotter's right to request a default judgement against Mangino.

On June 17, 2026, Trotter filed her second emergency TRO and Preliminary Injunction application, detailing how the state court had disregarded 21 federal, state, and regulatory procedural laws (A- 34, ¶27). She explained that because the state court had not addressed her defenses that she raised in any way, including those raised in her Motion to Dismiss, that the trial was quickly approaching, which without the District Court's intervention, would surely result in her eviction from her home. She argued that she had a likelihood of success on the merits of her Section 1983 claims brought pursuant to *Monell v. Dept. Soc. Servs.*, 436 U.S. 658 (1978), irreparable harm, serious questions going to the merits, balance of hardships, and that the District Court's intervention would serve the public interest (A- 38-46). Trotter expressly argued that the AIA did not bar Section 1983 claims (*Mitchum v. Foster*, 407 U.S. 225) and that the *Younger* abstention did not apply to the state court eviction. (*Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69). (A-46-47).

Again, neither Zawyrucha nor Mangino filed any affidavits or opposition to the second motion.

Nevertheless, on June 17, 2026, the District Court, once again, *sua sponte* denied the second motion via another docket-only order, erroneously asserting that Trotter sought to "relitigate" issues that it had "already decided" and that relief remained barred by *Younger* and the AIA. (See A- 4-5).

## SUMMARY OF THE ARGUMENT

This appeal challenges the District Court's reliance on bare docket text entries and its erroneous application of the Anti-Injunction Act and *Younger* abstention, to a properly pleaded 42 U.S.C. § 1983 action.

The District Court, *sua sponte*, denied both of Trotter's motions for preliminary injunction, claiming that its jurisdiction was "likely" barred by the Anti-Injunction Act and the Younger exception. Notwithstanding that this is not even a definitive ruling, both claims are false.

A federal court lacks authority to issue an injunction against a state proceeding under the AIA, unless the action falls into three exclusive gateways: The "Express Authorization" Exception**:** An Act of Congress expressly authorized it; The "In Aid of Jurisdiction" Exception"**:** The injunction is necessary to prevent a state court from subverting a federal court's concurrent, in rem jurisdiction over the same property or res; or The "Relitigation" Exception**:**

The injunction is necessary to protect or effectuate a prior federal judgment (preventing a party from relitigating an issue that a federal court has already actually decided.

Trotter's case is a 42 U.S.C.§ 1983. Congress explicitly carved 42 U.S.C.§ 1983 out of the AIA. Thus, when Trotter properly filed her Section 1983 complaint, the AIA's jurisdictional bar to issuing an injunction was legally erased by an Act of Congress.

The Younger Abstention is not jurisdictional. It has nothing to do with subject-matter jurisdiction. Younger is a prudential and equitable doctrine of judicial restraint rooted in "comity". In other words, the judge hearing the injunction admits it has jurisdiction, but out of respect for the state court, it chooses not to exercise it. This prudential discretion was severely limited to 3 instances by the Supreme Court to criminal prosecution, quasi-criminal matters or those uniquely in furtherance of the state courts' ability to perform its judicial functions. As 42 U.S.C. § 1983 was carved out of the AIA by Congress and the power to issue an injunction within this action does not fit into any of those three narrow exceptions, jurisdiction was never an issue. Yet, this non-issue was raised by the District Court- twice- when both times no defendant, frankly, even bothered to show up.

In applying this false rationale against Trotter's dire requests for injunctive relief—twice leaving her and her minor child to face imminent homelessness—the District Court applied a judicially created doctrine that does not exist. There is no absolute "eviction bar" that prevents federal courts from hearing a due process deprivation case, filed under the expressly authorized exception to 28 U.S.C. § 2283 and the Court's equitable discretion under Younger does not apply to a 42 U.S.C. § 1983. The District Court had jurisdiction to hear and decide both of Trotter's emergency motions. It just chose- unprompted- to abdicate its duty to do so, as did the Courts in every local case that the District Court cited. To wield this non-existent sword against Trotter, is to foreclose both the remedial purpose of 42 U.S.C. § 1983 and meaningful adjudication of her requests for federal protection.

## ARGUMENT

### I. The Court Erred in Applying a Local Inversion of the 28 U.S.C.§ 2283 and the Younger Abstention

#### A. The Inversion of 28 U.S.C.§ 2283 and Misapplication of the Younger Abstention

The local district courts have fabricated a blanket, absolute jurisdiction bar to Section 1983 cases. The purported doctrine is: if there is an "ongoing state court proceeding" then the court absolutely lacks jurisdiction to hear a temporary restraining order or preliminary injunction, pursuant to the Anti-Injunction Act and

the Younger abstention. No such doctrine exists; this rule is a gross distortion of both the AIA and the Younger abstention, which directly subverts the will of Congress.

**1. Congress Intentionally Altered "Our Federalism" and "Comity" as it Was in 1793**

The District Court's refusal to exercise its "expressly authorized" jurisdiction and its deployment of a locally created extension of the Younger abstention, fundamentally displaces the design of federal civil rights law.

42 U.S.C. §1983, is the modern version of the Civil Rights Act of 1871—otherwise known as the "Ku Klux Klan Act"— and was enacted for the express purpose of enforcing the provisions of the Fourteenth Amendment. *Mitchum v. Foster*, 407 U.S. 225, 238-239 (1972). This Act was part of *altering* our federal system as it was, prior to the Reconstruction era and the end of slavery —not maintaining it as it was— prior to that era. "Our Federalism" and "comity" as it was in 1793, did not encapsulate the federal rights of newly freed Black Americans, established by federal legislation and constitutional amendments, especially the Fourteenth Amendment. Congress had to enact what is now 42 U.S.C. §1983 because the former slave-owning Southern States, after the abolition of slavery, could not be trusted to respect the constitutional rights of Black people—including within their courts. The Supreme Court in *Mitchum* noted that

during the legislative debates regarding Section 1983's predecessor, the Act was intended to enforce the provisions of the Fourteenth Amendment against any state action, whether by the executive, legislative, or judicial branch. *Mitchum*, 407 U.S. at 240.

State courts in particular, were being used to injure or harass Black individuals, either because the courts were powerless to stop perpetrators or because they actively favored the injurious acts and sought to abrogate federally protected rights *Id.* Congress was forced to step in because these states courts had utterly failed—or refused—to protect the federal rights of their citizens. Legislators at the debate over the Act remarked:

> If the State courts had proven themselves competent to suppress the local disorders, or to maintain law and order, we should not have been called upon to legislate . . .. We are driven by existing facts to provide for the several states in the South what they have been unable to fully provide for themselves; i.e., the full and complete administration of justice in the courts…Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices . . .. (A)ll the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous things an injured party can do is to appeal to justice. *Mitchum*, 407 U.S. at 242.

One must take a breath at the severity and magnitude of the circumstances at the time. What the legislators describe in these profound words is complete and utter lawlessness in the state courts. The local district Courts' creation of a blanket, all-inclusive "ongoing state court proceedings" jurisdiction bar, erases the intent of

Congress when it enacted the Ku Klux Klan Act and reverts Black people back to the pre-Civil War era. To leave a citizen and her family exposed to imminent homelessness, by deploying a fabricated jurisdictional bar is not a neutral application of law; it is an abandonment of basic human regard. When a court is willing to let a family get pushed onto the outskirts of society, without care for their survival, it operates as if their rights—and their very humanity—do not matter. For Trotter, a Black woman navigating this system, this reversion is earthquakingly jarring. It treats her as if it is 1793, rendering the judicial buzzwords of "Our Federalism" and "comity" as code for the revival of a regime, where citizens can be stripped of shelter and security with complete impunity.

**2. *Umeze v. Johnson*, No. 25-CV-5610, 2025 WL 2644628, at *1 (S.D.N.Y. Sep. 15, 2025) Does Not Apply to Trotter's or Any Section 1983 Claims**

In denying Trotter's April 21, 2026, Order to Show Cause for a Temporary Restraining Order (TRO) and Preliminary Injunction (PI), the District Court cited *Umeze v. Johnson*, No. 25-CV-5610, 2025 WL 2644628, at *1 (S.D.N.Y. Sep. 15, 2025) (denying a preliminary injunction because the plaintiff's request for federal court intervention in a state court eviction proceeding was "likely" barred by *Younger*).

In *Umeze*, the plaintiff had filed a Section 1983 claim seeking to enjoin the Supreme Court of Bronx County, alongside three lawyers, three banks, and one

unnamed party, from enforcing any foreclosure sale, eviction, or transfer of title. The plaintiff alleged that the defendants had engaged in a fraudulent scheme designed to strip him of his home, livelihood, and medical practice.

The Court in Umeze found: "the relief Umeze seeks—federal court intervention in a state court eviction proceeding—is 'likely' barred by the Younger abstention doctrine" …

The Umeze court reasoned that:

> The *Younger* abstention doctrine cautions federal courts against enjoining or otherwise interfering in ongoing state proceedings. …When a plaintiff "seek[s] injunctive relief relating to the same property that is the subject matter of the underlying state court action [,]" *Younger* abstention applies… The *Younger* abstention doctrine cautions federal courts against enjoining or otherwise interfering in ongoing state proceedings. *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S 69, 77-78 (2013) (defining *Younger*'s scope); *see generally Younger v. Harris*, 401 U.S. 37, 43-45 (1971). *Abbatiello v. Wells Fargo Bank, N.A.*, No. 15 Civ. 4210, 2015 WL 5884797, at *4 (E.D.N.Y. Oct. 8, 2015); *see Clark v. Bloomberg*, No. 10 Civ. 1263, 2010 WL 1438803, at *2 (E.D.N.Y. Apr. 12, 2010) (holding that *Younger* abstention doctrine precludes federal district courts from staying pending state-court foreclosure and eviction proceedings because "both concern the disposition of real property and hence implicate important state interests, and there is no reason to doubt that the state proceedings provide [the plaintiff] with an adequate forum to make the arguments he seeks to raise in [federal] court").

Because both the *Umeze* and the District Court below were uncertain whether the *Younger* abstention barred jurisdiction—hence the tentative word "likely"—Trotter now dispels that doubt. *Sprint*, 571 U.S. at 77 states the exact opposite of what the Umeze Court claimed. Younger actually "cautioned" that

where federal courts have jurisdiction, it has a strict duty to hear and decide the matter before it:

> Federal courts…have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."…Jurisdiction existing, this Court has “cautioned”, a federal court's "obligation" to hear and decide a case is "virtually unflagging.” *Sprint Commc'ns, Inc.*, 571 U.S. at 77.

It follows that if the Umeze Court had jurisdiction, then its obligation to hear and decide Umeze’s request for injunctive relief was unflagging. *Id*.

The Sprint Court made concrete that "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Public Service, Inc v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 368 (1989). *Sprint Commc'ns, Inc. v. Jacobs*, at 78. Those exceptional circumstances are: (1) ongoing state criminal prosecutions (*NOPSI*, 491 U.S. at 368*)* (2) certain "civil enforcement proceedings" (*Huffman v. Pursue*, 420 U.S. 592, 604 (1975) and (3) civil proceedings involving certain orders ... uniquely in furtherance of the state courts' ability to perform their judicial functions." 491 U.S., at 368, 109 S.Ct. 2506 (*Juidice v. Vail*, 430 U.S. 327, 336, n. 12 (1977), and *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 13 (1987). *Umeze*’s "ongoing state court proceeding" was an eviction resulting from a foreclosure. Neither a matter of foreclosure nor one of eviction fits into any of these narrow exceptions. Thus, the *Umeze* court had jurisdiction to hear and decide *Umeze*’s motion for a preliminary injunction. Because that court had

jurisdiction, its obligation to hear and decide the injunction was "virtually unflagging." *Sprint*, 571 U.S. at 77. In other words, there is no general "caution" against enjoining or interfering with state proceedings in the abstract; the state proceeding must fall squarely within these limited exceptions.

In addition, “the pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (quoting *McClellan v. Carland*, 217 U.S. 268, 282, 30 S.Ct. 501, 54 L.Ed. 762 (1910) ). *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013). The Umeze Court claimed that because Umeze’s injunctive relief in federal court concerned “the same property that is the subject matter of the underlying state court action, Younger abstention applied.” Clearly this was not the actual holding by the Supreme Court. As the Umeze Court’s reasoning is a distortion of the actual holding, it had no basis to refuse its jurisdiction, simply because the federal and state court actions both concerned the same subject matter.

Furthermore, the types of civil enforcement proceedings eligible for *Younger* abstention are strictly limited to those that are “akin to criminal prosecution.” *Sprint*, 571 U.S. at 79. Matters akin to criminal prosecutions are civil state actions concerning enforcement proceedings initiated by the state itself to sanction a party for wrongful conduct. *See, e.g., Middlesex Cnty. Ethics Comm. v. Garden State*

*Bar Ass'n*, 457 U.S. 423, 433–434 (1982) (state-initiated disciplinary proceedings against a lawyer for violation of state ethics rules). In cases of this genre, a state actor is routinely a party and initiates the action:

> See, e.g., *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) (state-initiated administrative proceedings to enforce state civil rights laws); *Moore v. Sims*, 442 U.S. 415, 419–420, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (state-initiated proceeding to gain custody of children allegedly abused by their parents); *Trainor v. Hernandez*, 431 U.S. 434, 444, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (civil proceeding "brought by the State in its sovereign capacity" to recover welfare payments defendants had allegedly obtained by fraud); *Huffman*, 420 U.S., at 598, 95 S.Ct. 1200 (state-initiated proceeding to enforce obscenity laws).

Such proceedings commonly involve investigations culminating in formal complaints or charges. See, e.g., *Dayton*, 477 U.S., at 624, 106 S.Ct. 2718 (noting preliminary investigation and complaint); *Middlesex*, 457 U.S., at 433, 102 S.Ct. 2515. *Sprint Commc'ns*, *Inc. v. Jacobs*, 571 U.S. 69, 79-80 (2013). In contrast, the state itself is neither a party nor the initiator of a pending foreclosure, eviction action, or proceeding involving the "disposition of real property." Thus, foreclosures, evictions, and private real property dispositions are not "akin to criminal matters" requiring deference to the state courts.

As for the *Umeze* court's remaining reasoning—that "there is no reason to doubt that the state proceedings provide [the plaintiff] with an adequate forum to make the arguments he seeks to raise in [federal] court"—this verbiage imported the Eighth Circuit's erroneous application of the "Middlesex conditions." The

*Sprint* Court found that the appellate court had given these conditions "extraordinary breadth" and corrected that misapplication. Moreover, even in *Middlesex*, those conditions were applied to a state enforcement action against a lawyer initiated by an ethics committee—an application the Supreme Court made clear was "akin to a criminal proceeding." *Sprint*, 571 U.S. at 81–82. The Court then explicitly warned that if federal courts were allowed to extend the *Middlesex* conditions to any state court proceedings "divorced from their quasi-criminal context," *Younger* abstention could be improperly applied to *any* state court proceeding, that a federal court vaguely deemed to implicate a "state interest." *Ibid.* The *Umeze* court's reasoning represents precisely the unauthorized, erroneous use of those conditions against which the *Sprint* Court warned. Because *Younger* abstention did not apply in *Umeze*, that court had no legal basis to shirk its unflagging obligation to hear and decide the request for injunctive relief and this case did not and could not apply to Trotter's April 21st motion.

**3. *Keir v. Schoeberl* and *Virtue v. HB1 Alternative Holdings, LLC***

The District Court also applied *Keir v. Schoeberl*, No. 25-CV-0056, 2025 WL 437953, at *2–*3 (N.D.N.Y. Feb. 7, 2025) (finding that *Younger* and the AIA barred preliminary injunctive relief against foreclosure despite the plaintiff's underlying Section 1983 claim), *reconsideration denied*, 2025 WL

520764 (Feb. 18, 2025), to deny Trotter's June 17, 2026 motion for a TRO and preliminary injunction.

In *Keir*, the plaintiff sought an injunction in a Section 1983 action to enjoin Ulster County from proceeding with a tax lien foreclosure on her property, alleging unconstitutional taxation and nonjudicial foreclosure.

The court in *Keir* held that *Younger* abstention prohibited federal courts from intervening in "ongoing state court proceedings," including foreclosure actions that implicate significant state interests. It reasoned:

> "The abstention doctrine set out by the Supreme Court in *Younger v. Harris*, 401 U.S. 37, 43-45 (1971), cautions against enjoining or otherwise interfering in ongoing state proceedings". See *Sprint Comms., Inc. v. Jacobs*, 571 U.S 69, 77-78 (2013).

The District Court also applied *Virtue v. HB1 Alternative Holdings, LLC*, No. 25-CV-6345, 2026 WL 851377, at *3 (S.D.N.Y. Mar. 27, 2026) to deny Trotter's April 21st motion.

In *Virtue*, the plaintiff had been forcefully removed from her home after it was foreclosed upon, and subsequently filed a Section 1983 action claiming, *inter alia*, that the eviction violated her due process rights. Referring to prior Section 1983 cases that the plaintiff had filed on the same set of facts, the court found:

> Plaintiff sought a temporary restraining order to stop the ongoing state court eviction action. However, citing the Anti-Injunction Act, 28 U.S.C.

> § 2283, and the *Younger* abstention doctrine, the court explained that it was barred from enjoining an ongoing state court proceeding—including an ongoing foreclosure or eviction proceeding.

The same analysis dismantling the *Umeze* decision applies with equal force to these two cases. Thus, neither of these cases applied nor could have been applied successfully, to either of Trotter's motions for injunctive relief.

**4. *Billie v. Aurigremma*, No. 13-CV-1432, 2014 WL 1117860, at *1-*2 (D. Conn. Mar. 19, 2014) Does Not Apply to Trotter's or Any Section 1983 Claims**

To deny Trotter's June 17th request, the District Court also applied *Billie v. Aurigremma*, No. 13-CV-1432, 2014 WL 1117860, at *1–*2 (D. Conn. Mar. 19, 2014) (explaining that Anti-Injunction Act exceptions did not permit an injunction against eviction despite Section 1983 claims, and that such intervention was also barred by *Younger*).

In *Billie*, the plaintiff sought reconsideration of a denied injunction filed in support of claims alleging constitutional deprivations under the First, Fourth, Fifth, Seventh, and Fourteenth Amendments. She sought a stay of proceedings on a state court foreclosure judgment, claiming it was obtained by fraud (*Id.* at *1*). Specifically, she requested review of the state court judgment, an order vacating that judgment, and an injunction barring the state court from proceeding with the foreclosure judgment—proceedings properly barred under the *Rooker-Feldman* doctrine. *See Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923).

Nevertheless, the Billie court found:

> To the extent that Plaintiff seeks relief from an ongoing rather than a finalized state proceeding, her claims would be barred by *Younger* abstention…*Younger* abstention is mandatory when: (1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims…

Here, the *Billie* court actually lists the "Middlesex conditions" discussed in *Umeze*, treating them as the standalone standard for the *Younger* abstention. This is an erroneous application of those conditions. The "Middlesex conditions" are only applied after a federal court has already verified that the underlying state court proceeding falls within the 3 narrow exceptions of Younger. *Middlesex* fell under the state's interest in its sovereign capacity, to regulate the professional conduct and ethics of attorneys admitted to practice in its courts. *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 424 (1982)

A foreclosure between two private parties is not the state acting in its sovereign interests. Thus, the *Middlesex* conditions did not apply to *Billie* or Trotter's motion, where she sought to stay an unconstitutional eviction.

**5. *Smith v. Rocket Mortg. LLC*, No. 25-CV-6468, 2025 WL3300146, at *3 (W.D.N.Y. Sep. 11, 2025) Does Not Apply to Trotter's or Any Section 1983 Claims**

To deny Trotter's June 17th motion for injunctive relief the District Court applied *Smith v. Rocket Mortg. LLC*, No. 25-CV-6468, 2025 WL 3300146, at *3 (W.D.N.Y. Sept. 11, 2025).

In *Smith*, the plaintiff filed for an injunction against Rocket Mortgage seeking to enjoin the foreclosure of property he had lost, as well as all attempts by the mortgage company to collect on an outstanding mortgage. The plaintiff claimed that the defendants had "conspired" to deprive him of his property rights and sought injunctive relief from the court.

The court in *Smith* held:

> "Under the Anti-Injunction Act and *Younger* abstention, the Court finds that it lacks subject matter jurisdiction over Plaintiff's motion for a TRO [against foreclosure proceedings]; Plaintiff may elect to pursue the relief he seeks in state court to the extent it is available, but this Court does not have jurisdiction to adjudicate Plaintiff's requests for injunctive relief[.]"

Its reasoning was that the U.S. Supreme Court in *Younger v. Harris* purportedly:

> caution[ed] against enjoining or otherwise interfering in ongoing state proceedings and reasoned that "traditional principles of equity, but primarily on the even more vital consideration of comity," reflecting a "proper respect for state functions, a recognition of the . . . separate state governments, and a . . . belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

The actual language of *Younger* states:

> This underlying reason for restraining courts of equity from interfering with *criminal prosecutions* is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. *Younger v. Harris*, 401 U.S. 37, 44 (1971).

Clearly the crucial words "criminal prosecutions" are missing from the *Smith* court's truncated quotation. Had the excerpt been properly applied in its full context, the *Smith* court would have recognized that it provided no grounds for it to abstain, as the underlying matter was not a criminal prosecution, quasi-criminal or uniquely in furtherance of the state courts' ability to perform its judicial functions. By applying the truncated version of the *Younger* abstention, without the key limiting words that define its applicability, the *Smith* court misapplied the doctrine and improperly used it as a basis to abstain.

None of the aforementioned local district cases were properly adjudicated. As a result, they hold zero legal validity and zero precedential value to apply to Trotter's case—or any other underlying state case that is not within the 3 narrow exceptions of *Younger*. Thus, the District Court had jurisdiction to hear Trotter's motions for injunctive relief. As it had jurisdiction to hear and decide the motions,

it erred in refusing to perform its unflagging obligation to do so. *Sprint*, 571 U.S. at 77.

## B. The Erroneous Reinterpretation of the Anti-Injunction Act

A federal court may not grant an injunction to stay proceedings in a state court, except as expressly authorized by Act of Congress or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments. 28 U.S.C. §2283. To determine whether an Act of Congress qualified as "expressly authorized", the Supreme Court applied this test: the Act must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated, if the federal court were not empowered to enjoin a state court proceeding. Applying this test, the Supreme Court found that a federal court presiding over a 42 U.S.C. 1983, was expressly authorized to grant injunctive relief. *Mitchum v. Foster* 407 U.S. 225, 237-238 (1972).

### 1. *Ochei v. Lapes*, No. 19-CV-3700, 2020 WL 528705, at *3-*4 (S.D.N.Y. Jan. 31, 2020) Does Not Apply to Trotter's or Any Section 1983 Claims

Nevertheless, the District Court applied *Ochei v. Lapes*, No. 19-CV-3700, 2020 WL 528705, at *3-*4 (S.D.N.Y. Jan. 31, 2020) (holding that the Anti-Injunction Act and Younger bar a federal court from enjoining state court eviction proceedings), to deny Trotter's April 21st motion for injunctive relief.

Plaintiff Ochei had filed a Section 1983, but the Court found that she had failed to state a claim against the defendants. Yet, the Court also found that:

> The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "[A]ny injunction against state court proceedings otherwise proper . . . must be based on one of the specific statutory exceptions [in the Act] if it is to be upheld." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970).
>
> State-court proceedings "should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately" the United States Supreme Court.
>
> The Anti-Injunction Act "applies when the requested injunction would…stay the ongoing state proceedings…Courts in this Circuit have long held that the Anti-Injunction Act applies to state-court eviction proceedings. See *Watkins v. Ceasar*, 88 F. App'x 458, 459 (2d Cir. 2004)

Ochei's case was a Section 1983. 42 U.S.C. §1983 is an expressly authorized exception to 28 U.S.C. § 2283. Because Ochei involved a Section 1983 action—and Section 1983 falls squarely under the "expressly authorized" exception of the Anti-Injunction Act—the AIA did not bar the requested injunctive relief.

Moreover, *Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 287 (1970), addressed only the second and third exceptions to the AIA. Section 1983 falls under the first exception. *Mitchum v.*

*Foster*, 407 U.S. at 242–243 (1972). Most importantly the Supreme Court's actual finding was:

> [T]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" *Ex parte Virginia*, 100 U.S., at 46, 25 L.Ed. 676. In carrying out that purpose, Congress plainly authorized the federal courts to issue injunctions in § 1983 actions, by expressly authorizing a 'suit in equity' as one of the means of redress. And this Court long ago recognized that federal injunctive relief against a state court proceeding can in some circumstances be essential to prevent great, immediate, and irreparable loss of a person's constitutional rights. *Mitchum,* 407 U.S. at 242.

Clearly the Ochei Court's version does not reflect the Supreme Court's actual reasoning. Moreover, given the backdrop of the purpose of §1983, state court proceedings absolutely should not be allowed to continue unimpaired by intervention from lower federal courts. Congress passed §1983 for the specific purpose of making sure that state actors could not deprive constitutional rights in state courts- unencumbered. Subsequently, the Ochei Court erroneously applied a distorted version of the AIA, which flipped Congress's exception to the Anti-Injunction Act and its purpose upside down.

In addition, *Watkins v. Ceasar*, 88 F. App'x 458, 459 (2d Cir. 2004), is an unpublished summary order and, consequently, non-binding precedent. It cannot be cited or applied to supersede the Supreme Court and its established law of the

land. Thus, if courts of this Circuit have long relied upon this non-binding order, those same courts have foreclosed access to the remedial purpose of 42 U.S.C. § 1983 for an equally long duration. Trotter respectfully implores this Court to put a stop to this erroneous practice.

**2. The Erroneous Findings of *Keir*, *Billie* and *Smith***

These local cases meet the same fate with respect to the AIA. The Court in Keir found: "Here, plaintiff's PI Motion does not advance any of the delineated exceptions. Furthermore, "[c]ourts in this Circuit have repeatedly held that the Anti-Injunction Act bars a federal court from enjoining state-court eviction proceedings." Keir was a Section 1983 case. Thus, it fell squarely into the first exception to the AIA.

Billie was also a Section 1983 case. Had it not been barred by the Rooker-Feldman doctrine, it too would have fallen within the first exception of the AIA.

The Court in Smith found: "[Plaintiff's] motion for a TRO does not fall within any of the three Anti-Injunction Act exceptions as (1) there is no congressional Act exempting foreclosure actions from the Anti-Injunction Act." Smith claimed that the defendants "conspired to deprive him of his property rights". This is also a claim under Section 1983 claim. While there is no exception exempting foreclosure from the AIA, there is one exempting cases brought under

Section 1983. As Smith's case was a Section 1983, it fell within the first exception to the AIA.

**3. *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 322-23 (E.D.N.Y. 2012) – Trotter Was Not Required to Return to the State Court to Raise Her Section 1983 Claim**

To deny Trotter's June 17th motion for injunctive relief, the District Court cited *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 322–23 (E.D.N.Y. 2012) (explaining that state courts are authorized to consider any defenses, even in a summary eviction proceeding).

In *Sinisgallo*, the plaintiffs brought an action against the Town of Islip Housing Authority. They alleged that the defendants had terminated their public housing tenancy, in violation of their constitutional due process rights, claiming that the housing authority's hearing officer deprived them of an impartial decisionmaker. Although one of the plaintiffs' claims arose under 42 U.S.C. § 1983, the *Sinisgallo* court did not address its jurisdiction to hear a motion for an injunction, requested in an action brought under that statute. It skipped right over discussing its threshold jurisdiction under the first exception to the AIA. *Sinisgallo*, 865 F. Supp. 2d at 316. It then—without having analyzed and declared its jurisdiction to do so—proceeded directly to the merits. It found that the plaintiffs failed to show a likelihood of success on the merits, because they failed to allege

that the Islip Housing Authority had a custom or policy of depriving tenants of impartial hearings.

The *Sinisgallo* Court could not make a valid merits determination without first exercising proper jurisdiction over the Section 1983 claim, which it had under the first exception of the AIA.

More importantly, the *Sinisgallo* Court also applied the fabricated rule: “unless the Plaintiffs' federal disability claims fit within one of three exceptions, the Anti–Injunction Act precludes this Court from enjoining a state court eviction proceeding.” It too cited the nonprecedential, unpublished summary order, *Watkins v. Ceasar,* 88 Fed. Appx. 458, 459 (2d Cir.2004) referring to the “collecting cases”, the local cases discussed earlier in this brief. The fact that a state court proceeding does not come within the narrow exceptions of the AIA does not lead to the logical conclusion that the court was barred from hearing an eviction in particular. Younger provides no such coverage.

With respect to the *Sinisgallo* Court’s claim that the plaintiffs could return to a summary eviction court to seek relief, this comes from its lengthy discussion on state law. According to the Court, the plaintiffs could return to the state court summary eviction and present their federal claims for deprivations of their constitutional rights as “defenses”. *Sinisgallo*, 865 F.Supp.2d at 322-323. Such a claim directly contradicts the foundational design and statutory purpose of Section

1983. *Mitchum*, 407 U.S. at 42. Relegating a federal civil rights plaintiff back to the state courts, to challenge unconstitutional state and municipal action, nullifies the statute's core remedial objective. Congress did not enact the Ku Klux Klan Act of 1871 so that victims of systemic constitutional violations could seek refuge in the same state forums that enabled the deprivation; it enacted Section 1983 precisely to guarantee a federal forum.

Further, *Sinisgallo* examined the second exception to the AIA, not the first. The District Court’s contention that Trotter could raise her 42 U.S.C. § 1983 claim in a parallel state summary eviction proceeding is premised entirely on *Sinisgallo*’s resort to the second exception of the Anti-Injunction Act—an analysis necessitated only because that court treated the first exception as unavailable. The District Court faced no such limitation. Trotter bore no burden to prove that her *Monell* claim fit within the second exception when Congress made the first exception readily available under Section 1983. Consequently, whether Trotter could assert her Section 1983 claim within a summary eviction proceeding—which she could not—was entirely beside the point. Trotter was never required to litigate under the framework of the second exception.

In addition, Trotter's case is readily distinguishable from *Sinisgallo* regarding the pleading of a *Monell* custom or policy. Had the District Court properly adjudicated her motions or held a hearing, it would have found that

Trotter's complaint meritoriously pleads an unconstitutional policy or custom against CDCLI, sharply distinguishing her claims from those of the plaintiffs in *Sinisgallo*.

Because *Sinisgallo* did not analyze a federal court's jurisdiction to hear an injunction within a Section 1983, the Court applied the nonexistent "eviction bar" and dealt with the second exception of the AIA and not the first, *Sinisgallo* did not apply to Trotter's motion.

Accordingly, none of these cases applied to either of Trotter's motions for preliminary injunction or any other application for injunctive relief, brought within a Section 1983.

**II. The District Court Erred in Refusing to Exercise its Jurisdiction Over Trotter's Motions for Temporary Restraining Orders and Preliminary Injunction**

Because 42 U.S.C. § 1983 is an expressly authorized exception to the Anti-Injunction Act, the District Court possessed full jurisdiction to grant both temporary restraining orders and preliminary injunctions. *Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972).

To reiterate, circumstances fitting within the *Younger* doctrine are "exceptional"; they include "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders that are uniquely in

furtherance of the state courts' ability to perform their judicial functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013). Outside of these narrow exceptional circumstances, the Supreme Court has instructed that a federal court's obligation to hear and decide a case is "virtually unflagging." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Parallel state-court proceedings do not detract from that obligation. *Sprint*, 571 U.S. at 77.

On April 21, 2026, Trotter filed her meritorious Section 1983 complaint in the district court, along with her Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, to enjoin the unconstitutional state court eviction proceedings. She attached a sworn affidavit and argued that she had shown a serious question going to the merits. Trotter asserted:

> Plaintiff has, at minimum, raised sufficiently serious questions going to the merits to make them a fair ground for litigation. Specifically, this action presents the substantial question of whether CDCLI's policy, custom, or usage enables landlords, specifically in this case, Defendant Mangino, to bypass procedural due process rights provided by 42 U.S.C. § 1437f and 24 C.F.R. §982, for tenants, before terminations of tenancy and instead evict tenants at will.

Despite Defendant Zawyrucha and Mangino failing to appear or contest the motion, the District Court, *sua sponte*, denied relief on April 22, 2026, via a text-only docket entry, containing zero findings of fact and zero conclusions of law. (See A-2). The court recited the injunctive elements, skipped over applying them to Trotter's sworn facts, and applied the phantom "ongoing state court" bar

purportedly based on *Younger v. Harris*, 401 U.S. 37 (1971) and the Anti-Injunction Act (AIA). Then, even with said serious question explicitly before it, it ruled that Trotter had not shown any serious question going to the merits. On April 22, 2026, the District Court denied the injunction via its text-only docket order, stating:

> Pro se Plaintiff Kyung L. Trotter's motion for a temporary restraining order and preliminary injunction is denied. To obtain a preliminary injunction, a party must clearly show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."
>
> Trotter seeks an order enjoining Defendants from carrying out any eviction or removal of Trotter from a residence and staying ongoing state court eviction proceedings. (Proposed O.S.C., Dkt. No. 2 at 1-2). Trotter's landlord is currently pursuing eviction proceedings in state court, and Trotter has filed a motion to dismiss in that court that has been pending since April 2, 2026. (Aff. in Supp. of O.S.C., Dkt. No. 2 ¶¶ 4-6). Because Trotter seeks injunctive relief against ongoing state court eviction proceedings, the request is “likely” barred by *Younger v. Harris*, 401 U.S. 37 (1971) and the Anti-Injunction Act, and thus Trotter has not demonstrated either a likelihood of success on the merits or sufficiently serious questions on the merits.

The District Court then cited the aforementioned line of nonprecedential, district court decisions. Because these purported cases rest upon distorted interpretations of Supreme Court precedent regarding the *Younger* abstention and the Anti-Injunction Act, they possess no valid legal authority. Consequently, they had no

application to Trotter's motions—or to any other motions for injunctive relief presented within a Section 1983 action.

**A. Trotter Showed a Likelihood of Success on the Merits of Her Claims**

To justify a preliminary injunction, a movant must demonstrate: (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public interest weighs in favor of granting an injunction. *Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).

Trotter applied her specific facts to each of these elements, step by step, in her brief supporting her second motion for a preliminary injunction, filed on June 17, 2026. To demonstrate a likelihood of success on the merits of her Section 1983 claim, Trotter asserted how CDCLI operated as a state actor under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (See A-38-39). Trotter explained CDCLI's custom or policy of "automatic month to month" tenancy conversion. (See A-41). She detailed how Defendant Mangino qualified as a state actor by acting jointly with CDCLI and articulated the governing legal standards under Section 1983. (See A-39).

Furthermore, Trotter identified her protected property interests including in her Housing Choice Voucher (HCV) benefit. *Goldberg v. Kelly*, 397 U.S. 254,

261-262 (1970). *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). She asserted that to deprive her of this benefit, CDCLI was strictly required to provide an administrative hearing under 24 C.F.R. § 982.555. (See A-40).

Trotter exposed CDCLI's method of evasion—an "automatic month-to-month" tenancy conversion custom—explaining how Defendant Mangino utilized this practice to collect Housing Assistance Payments (HAP) while stripping her of the statutory protections tied to an active voucher, most notably the requirement of "good cause" before termination. This unlawful workaround formed the core mechanism driving the "ongoing state court proceeding." (See A- 41).

Trotter further asserted that she possessed a protected property interest in her continued tenancy, secured by the interlocking framework of the lease, the HAP contract, and the Tenancy Addendum. (See A-41). CDCLI's custom systematically eliminated these protections by bypassing the mandatory framework entirely.

Because Trotter asserted state action, CDCLI's *Monell* liability, Mangino's termination of her tenancy without notice or good cause, an ongoing unconstitutional eviction predicated on a defective pleading that evaded the mandatory showing of good cause, and the core due process deprivations recognized in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982), she asserted enough for the District Court to conclude that she had demonstrated a strong likelihood of success on the merits of her claims.

**B. Trotter Raised Six Questions Going to the Merits of Her Claims**

Contrary to the District Court's unfounded assertion that Trotter failed to raise serious questions going to the merits, Trotter expressly set forth six distinct, substantial questions in her supporting brief:

1) Whether CDCLI has a policy or custom, which deprives HCV tenants of due process, before its participating landlords may terminate the tenancies of voucher holders, in violation of 42 U.S.C. § 1437f and 24 CFR §982
2) Whether Defendant Seven Tier, LP (Seven Tier) failed to serve the Plaintiff predicate notice compliant with 42 U.S.C. § 1437f and 24 CFR §982.310 before terminating her tenancy, in violation of due process
3) Whether 42 U.S.C. § 1437f and 24 C.F.R. §982 provide that a tenant automatically becomes a "month to month" tenant after her first lease term expires
4) Whether Seven Tier, LP engaged in a constitutional "end run" with CDCLI to deprive the Plaintiff of her HCV benefit
5) Whether Seven Tier filed a petition for eviction against the Plaintiff, deliberately concealing her Section 8 status, to avoid having to show good cause under the aforesaid statute and regulation, depriving her of procedural due process and
6) Whether Defendant Zawyrucha engaged in conduct which deprived the Plaintiff of procedural due process-in the parallel summary eviction at issue. (see A- 43)

Thus, Trotter did not fail to show serious questions going to the merits and the District Court erred in purportedly finding that she had not. Although the landlord questions concerned Seven Tier, the answers to these questions are the same for Mangino.

Moreover, Trotter met the remaining elements. She continued to apply how she would suffer irreparable harm absent an injunction, (*Id*. at 23-24), the balance of hardships tipped her in favor, (*Id* at 24) and how a temporary

restraining order would be in the public's best interest, although she referred to a "temporary restraining order" meaning a preliminary injunction. (*Id*. at 24-25).

The District Court erred in refusing to exercise the jurisdiction, it surely had to hear and decide both motions. With respect to the District Court's June 17, 2026, docket entry order, Trotter could not seek to "relitigate" issues she had never been given a fair opportunity to litigate in the first place. Furthermore, the District Court had not "already decided" anything on the initial motion; it merely declared that relief was "likely" barred, recited the elements of injunctive relief, and asserted a local, non-existent "ongoing state court" bar to its jurisdiction, instead of exercising it to adjudicate those elements. (See A- 4-5).

Trotter presented a meritorious, 42 U.S.C. § 1983, and thoroughly broke the elements of the same down to the Court. As Trotter's suit was a 42 U.S.C. § 1983, the District Court was expressly authorized by Congress[1] to adjudicate her motions for injunctive relief which she filed along with her Complaint and to definitively decide whether she had shown a likelihood of success on the merits, or serious questions going to the merits. Instead, the District Court completely abdicated its duty to do so, asserting doctrines which contained zero validity and zero precedential value.

[1] *Mitchum v. Foster*, 407 U.S. 225, 242–43 (1972).

Moreover, as the parallel, unconstitutional state court eviction was not a criminal prosecution, civil enforcement proceeding akin to a criminal matter or a civil proceeding involving certain orders uniquely in furtherance of the state court's ability to perform its judicial functions, the District Court had an unflagging obligation, to hear and decide both Trotter's April 21 and June 17, 2026 motions. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013).

Further, the District Court engaged in an untenable contradiction: while claiming to be "likely" without jurisdiction, it simultaneously purported to determine that Trotter had "not demonstrated either a likelihood of success on the merits or sufficiently serious questions on the merits." A court cannot logically conclude that it is "likely" barred from exercising jurisdiction while simultaneously ruling upon the merits of a provisional remedy.

Because the District Court applied a nonexistent, manufactured bar to its jurisdiction, and in doing so, claimed that Trotter failed to show a likelihood of success or serious questions going to the merits, the Court committed reversible error. It had expressed authority to grant an injunction and an unflagging obligation to hear and decide both Trotter's April 21 and June 17, 2026 motions to stay the state court eviction proceedings.

**Standard of Review: The Underlying Legal Premises Are Reviewed De Novo**

This Court reviews the District Court's interpretation of the Anti-Injunction Act *de novo*, including its conclusion that the Act barred the requested § 1983 relief. *Wyly v. Weiss*, 697 F.3d 131, 137 (2d Cir. 2012). Whether *Younger* requires abstention from an eviction state court proceeding when the federal plaintiff has filed a Section 1983, is likewise reviewed *de novo*. *Diamond "D" Construction Corp. v. McGowan*, 282 F.3d 191, 197–98 (2d Cir. 2002). As the District Court erroneously interpreted the AIA and the Younger abstention, this Court should review its docket only entries *de novo*.

Although the ultimate denial of preliminary injunctive relief is ordinarily reviewed for abuse of discretion, a ruling resting on an erroneous legal premise *is* an abuse of discretion. *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001). As the District Court's premise which it applied to both motions was that the AIA and Younger abstention provided a jurisdictional and prudential bar, just because the parallel state court proceeding was an eviction was erroneous, the District Court abused its discretion and such abuse should be reviewed *de novo*.

**III. The Court Erred in Not Issuing a Written Order Containing Findings of Facts and Conclusions of Law under Fed. R. Civ. P. 52(a)(2)**

**Standard of Review: Lack of Compliance with Rule 52(a)(2)**

Whether the District Court complied with the governing procedural requirement of Fed. R. Civ. P. 52(a)(2) presents a question of law reviewed *de novo*. See *Sinkler v. Berryhill*, 932 F.3d 83, 86 (2d Cir. 2019). Trotter challenges the District Court's failure to state the findings of fact and conclusions of law required by Rule 52(a)(2). This is a legal compliance question. Accordingly, this Court must independently determine, without deference to the District Court, whether the docket-text entries satisfy Rule 52(a)(2).

Federal Rule of Civil Procedure 52(a) provides, in pertinent part, that "in granting or refusing interlocutory injunctions the court must set forth the findings of fact and conclusions of law which constitute the grounds of its action." Fed. R. Civ. P. 52(a)(2) (emphasis added); *see also Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 319 (1940). The operative word is "must," meaning the district court has no discretion to bypass this mandatory procedural safeguard which commands it to compose a written order.

On April 21, 2026, Trotter filed her first Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction to enjoin the state court proceedings and prevent Defendant Mangino from prosecuting an

unconstitutional eviction against her. Despite Mangino's nonappearance and the complete absence of any submitted contravening affidavits of fact, the District Court denied the motion on April 22, 2026, via a text-only docket entry. The court issued no written opinion, entering zero findings of fact and drawing no independent conclusions of law. Instead, the docket entry merely recited the legal elements of a TRO and PI, skipped over applying them to the evidentiary record, and invoked a phantom local "ongoing state eviction" bar. It then illogically concluded that because its jurisdiction was supposedly barred, Trotter had failed to show a likelihood of success or serious questions going to the merits.

Similarly, on June 17, 2026, the District Court denied Trotter's second motion by another bare text-only docket entry, referring back to its unadjudicated first order, reapplying the non-existent local bar, and asserting that its prior "reasoning" governed. Because the court never adjudicated the first motion by applying the legal elements to the record, it possessed no legal reasoning to carry forward.

Both text-only docket entries flagrantly violate Federal Rule of Civil Procedure 52(a). As the Supreme Court emphasized: "It is of the highest importance to a proper review of the action of a court in granting or refusing a

preliminary injunction, that there should be fair compliance with Rule 52(a) of the Rules of Civil Procedure..." *Mayo*, 309 U.S. at 316.

Because the District Court completely failed to comply with Rule 52(a)—issuing bare docket entries devoid of factual findings or legal analysis—it committed reversible error. Under a *de novo* review of these procedural and legal defaults, the District Court's failure to enter written findings of fact and conclusions of law deprives this Court of the foundation necessary to conduct a proper review and independently requires vacatur.

**IV. The District Court Erred in Not Setting Out its June 17 and April 22, 2026 denials of Trotter's Motions for Preliminary Injunction on Separate Documents**

**<u>Standard of Review: Lack of Compliance with Fed. R. Civ. P. 58(a)</u>**

Whether the District Court complied with the governing procedural requirement of Fed. R. Civ. P. 58(a) presents a question of law reviewed *de novo*. See *Sinkler v. Berryhill*, 932 F.3d 83, 86 (2d Cir. 2019).

Fed. R. Civ. P. 58(a) requires a judgment to be set out in a separate document, and Fed. R. Civ. P. 54(a) defines "judgment" to include an order from which an appeal lies. Trotter's applications at D.E. 2 and D.E. 29 each sought a temporary restraining order and a preliminary injunction. The District Court denied each application by docket-text entry; the docket report does not show a separate

document disposing of either preliminary-injunction request. Accordingly, this Court should determine *de novo* whether the docket-text entries satisfied Rule 58(a)'s separate-document requirement, read together with Rule 54(a).

## V. The District Court Erred in *Sua Sponte* Denying Trotter's Motions for TROs and PIs, Altering the Procedural Playing Field in Defendants' Favor

### A. Trotter's Civil-Rights Complaint and Supported Emergency Applications Required Meaningful Consideration

Trotter presented a meritorious § 1983 complaint, supported her preliminary-injunction applications with a detailed factual affidavit and legal argument, and sought federal protection against imminent loss of her home. The District Court nevertheless asserted categorical purported abstention and Anti-Injunction Act barriers, on its own initiative and used those barriers to conclude that Trotter had not demonstrated likelihood of success or serious questions going to the merits. It stated: "Because Trotter seeks injunctive relief against ongoing state court eviction proceedings, the request is likely barred by *Younger v. Harris*, 401 U.S. 37 (1971) and the Anti-Injunction Act, and thus Trotter has not demonstrated either a likelihood of success on the merits or sufficiently serious questions on the merits." That conclusion does not follow. The court's assertion that relief was categorically unavailable did not establish that Trotter's constitutional claims lacked a likelihood of success on or presented no serious

questions going to the merits. Instead, the Court's asserted nonexistent bar displaced the merits inquiry altogether.

"No principle is more fundamental to our system of judicial administration than that a person is entitled to notice before adverse judicial action is taken against him." *Lugo v. Keane*, 15 F.3d 29, 30 (2d Cir. 1994) (per curiam). *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 82 (2d Cir. 2018).

Trotter received no such notice from the District Court. On both April 22 and June 17, 2026, the District Court simply raised its purported bar to its jurisdiction— on its own—and denied the motions for injunctive relief. Trotter was entitled to notice and an opportunity to be heard, before the Court took this adverse, *sua sponte* action against her. *Id*. *Day v. McDonough*, 547 U.S. 198, 210 (2006).

The District Court's procedural error was not Trotter's failure to overcome that supposed bar. It was the court's *sua sponte* use of that nonexistent bar, without prior notice and an opportunity for Trotter to contest its legal existence and applicability, to foreclose consideration of her emergency application. *Catzin* explains that the required predecision opportunity protects against a court overlooking valid answers to its perceived defects in a litigant's case. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 82–83 (2d Cir. 2018). Here, Trotter's

answer was that the categorical rule itself was contrary to governing law—not that her circumstances satisfied an exception to a valid eviction bar.

"*[S]ua sponte* dismissals are not favored, particularly where no party has raised the issue, and there is no notice or hearing". *Doe v. St. Joseph's Hospital of Ft. Wayne*, 788 F.2d 411, 415 (7th Cir.1986). *Perez v. Ortiz*, 849 F.2d 793, 797 (2nd Cir. 1988). Neither Defendant Mangino nor his counsel appeared when Trotter filed her April 21st motion. By June 17th, Mangino was in default. So, he could not raise any issues and once again, Zawyrucha did not appear or contest the emergency motion. It is bad enough that the eviction bar does not exist, but the fact that nobody raised them makes deprivation of Trotter's opportunity to make a case to stay in her home, ten times worse. The District Court's *sua sponte* action where no party even raised its purported issues are disfavored by this Court.

*Logan* recognizes that a cause of action can constitute protected property and that due process safeguards meaningful presentation and adjudication of the claim. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–30, 433–37 (1982). Trotter invokes that principle here.

**<u>Standard of Review: No Opportunity to be Heard</u>**

Whether the District Court provided the notice and meaningful opportunity to respond required before the challenged *sua sponte* rulings is reviewed *de novo*. *Ethridge v. Bell*, 49 F.4th 674, 680 (2d Cir. 2022).

## B. The Court's Refusal Stripped Trotter of the Opportunity to Secure the Tactical Advantage of a Favorable Merits Determination

A preliminary-injunction application is not merely a paper to be accepted or rejected. It places the plaintiff's substantive case before the court at the moment preventive relief matters most. A favorable likelihood-of-success determination—or a finding of serious questions going to the merits, together with the other required elements—gives the plaintiff an immediate judicially recognized position of strength. Defendants must then confront the plaintiff's civil rights claim, in a status where its substantive force has received judicial consideration, rather than proceeding, filing Rule 12 motions as if the claims were facially dismissible.

Trotter was required to seek this assessment. By refusing to undertake it, the District Court deprived her of the opportunity to obtain the weight and procedural leverage of a favorable merits determination. The court instead permitted the purported jurisdiction barriers to stand in place of a substantive ruling, leaving Defendants free of the scrutiny and litigation pressure that a properly adjudicated emergency application would impose.

The harm was not confined to the absence of temporary protection. The court's reasoning converted its own refusal to assess Trotter's case into a fatal characterization of that case.

## C. The Court Supplied a Procedural Shield for Defendants Who Had Not Opposed the Application

Mangino and Zawyrucha did not appear or contest Trotter's first application. Trotter had placed her sworn account and supporting law before the court. Instead of scrutinizing those submissions through a fair adversarial process, the District Court supplied its own categorical rationale for denying relief.

That conduct matches the governing rule's warning against transforming the judge from an independent adjudicator into a proponent. In *Perez*, defendants had not requested the relief the court granted on its own initiative; the Second Circuit identified the resulting departure from adversarial adjudication and reversed the judgments. *Perez v. Ortiz*, 849 F .2d at 797–798. Here, the Court's rationale replaced the substantive opposition that Defendants had not supplied and Defendants received the practical benefit of denial, without submitting contrary affidavits or confronting the substantive grounds presented by Trotter. Thus, the District Court transformed from independent adjudicator into proponent for Mangino and Zawyrucha.

The Court's role is to be a neutral arbiter— not an advocate or defense counsel for absent Defendants.

**<u>D. The June 17 Denial Entrenched the Same Procedural Disadvantage as the Emergency Became More Urgent</u>**

Trotter's second June 17th application expressly challenged the Anti-Injunction Act and *Younger* abstention and sought protection as the eviction trial became imminent. (See A- 45-47). The District Court nevertheless treated her request as an attempt to "relitigate issues already decided" and reaffirmed what the Court claimed were barriers.

That characterization compounded the original deprivation. Trotter was seeking consideration of the substantive grounds that the first ruling had excluded. Treating the second request as improper relitigation, allowed the earlier refusal to assess those grounds to become the justification for refusing again. The first denial deprived Trotter of a merits determination; the second treated that deprivation as if it were an adjudication binding the second application.

Trotter contends that the repetition demonstrates more than an isolated legal mistake. Twice, the court's chosen procedure operated in Defendants' favor: their challenged eviction could continue, while Trotter's request for timely federal protection was rejected, through the same categorical obstacles. She offers that pattern, along with the Court's *sua sponte*, June 10th order, restricting her from filing for a default judgment against Mangino, as support for her contention that

the Court tipped the procedural scales against her, not merely that it reached results with which she disagrees. (See A- 54).

**E. The Refusal Undermined the Preventive Function of the Federal Civil-Rights Remedy**

Trotter sought protection before displacement, not merely an eventual ruling after the injury she asked the court to prevent. The court's refusal forced her to fight on two fronts: defend her home in the state eviction proceeding and simultaneously contest the federal court's asserted barriers to considering her constitutional grounds for relief. That burden frustrated the practical purpose of the emergency applications. A pending complaint offered no substitute for timely consideration of whether federal intervention was necessary. Leaving the complaint on the docket while excluding the request for preventive relief preserved the appearance of access without providing the adjudication needed when the threatened injury was imminent.

Trotter's policy argument follows directly from this procedural harm. The independent federal remedy loses its protective force if the court can reject emergency applications through a fabricated, categorical rule and then cite that rejection as evidence that the plaintiff's claims lack substantive strength. Such treatment rewards Defendants' inaction, burdens the civil-rights plaintiff, and converts a request for urgent federal protection into a procedural gauntlet.

### F. Vacatur Is Necessary to Remedy the Procedural Error and Restore Fair Adjudication

Trotter submits that the April 22 and June 17 denials deprived her of meaningful consideration, stripped her of the opportunity to gain a tactical advantage through a supported preliminary-injunction application, and supplied Defendants with a procedural shield against substantive scrutiny. The resulting prejudice is inseparable from the court's challenged legal premises: those premises prevented the assessment, and the absence of a favorable assessment was then attributed to Trotter's failure to demonstrate the merits.

The Fifth Amendment's guarantee of due process requires meaningful and evenhanded adjudication, not a procedure that substitutes erroneous barriers for consideration of a meritorious civil-rights complaint and sworn grounds for emergency relief.

## VI. CDCLI Lacks Standing to Litigate the Injunction Controversy on the Strength of Its Status as a Defendant in the Underlying Action

CDCLI was not the subject of either injunction application, and neither appealed order concerned CDCLI. Appellant therefore objects to CDCLI's participation as an active appellee in this discrete interlocutory controversy. CDCLI's presence as a defendant on other claims does not establish that the requested preventive relief implicates its own rights or obligations. The Court

should apply the reasoning of *Diamond v. Charles* to reject an asserted entitlement to litigate this controversy based solely on CDCLI's status in the broader action.

In *Diamond*, the Supreme Court examined the interests the intervening defendant asserted in defending the challenged statute. It rejected speculative professional benefits, an abstract desire for compliance with the law, and unsupported assertions of parental interests as insufficient to establish a concrete stake. The inquiry concerned the litigant's actual connection to the particular provisions under review, not simply his interest in the general subject or his participation below. *Diamond v. Charles*, 476 U.S. 54, 64–67 (1986). That reasoning supports Trotter's objection here.

Neither application sought an injunction against CDCLI, and neither denial adjudicated CDCLI's rights or obligations. The existence of other claims against CDCLI cannot itself supply the missing connection to the particular preventive relief now under review. Trotter submits that CDCLI cannot convert an interest in the outcome of litigation involving its codefendants into standing to litigate that distinct controversy in its own right.

The provision-specific analysis in *Diamond* is particularly instructive. Diamond's reliance on a parental-notification provision did not support continued litigation because the validity of that provision was not before the Court. His involvement with the statute as a whole did not establish standing concerning the

provisions actually under review. *Id.* at 66–67. By exact analogy, CDCLI's presence in the broader federal action cannot supply a cognizable legal stake in an interlocutory appeal, confined entirely to relief that was never sought against it. Just as a general interest in a statute cannot establish standing over unreviewed provisions, CDCLI's involvement in separate claims cannot manufacture standing to defend an injunction that has nothing to do with them.

## CONCLUSION

The district court's docket entry only orders entered on April 22nd and June 17th, denying Trotter's motions for temporary restraining orders and preliminary injunctions should be vacated, and remanded, with instructions to conduct independent merits assessments under the proper governing standards, and to compose findings of facts and conclusions of law explaining the dispositions.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kyung L. Trotter, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains **11,971** words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

/s/ *Kyung L. Trotter*
KYUNG L. TROTTER
Plaintiff, Pro Se
374 Donald Blvd
Holbrook, NY 11741
(631) 202-7887

# ADDENDUM

# 24 C.F.R. § 982.310 Owner Termination of Tenancy

| | |
|---|---|
| **Library:** | Code of Federal Regulations |
| **Edition:** | 2026 |
| **Currency:** | Current through September 30, 2026 |
| **Citation:** | 24 C.F.R. § 982.310 |
| **Year:** | 2026 |

**vLex Document Id:** VLEX-1114592008

**Link:** https://app.vlex.com/vid/24-c-f-r-1114592008

(a) Grounds. During the term of the lease, the owner may not terminate the tenancy except on the following grounds:

(1) Serious violation (including but not limited to failure to pay rent or other amounts due under the lease) or repeated violation of the terms and conditions of the lease;

(2) Violation of federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the premises; or

(3) Other good cause.

(b) Nonpayment by PHA: Not grounds for termination of tenancy.

(1) The family is not responsible for payment of the portion of the rent to owner covered by the housing assistance payment under the HAP contract between the owner and the PHA.

(2) The PHA failure to pay the housing assistance payment to the owner is not a violation of the lease between the tenant and the owner. During the term of the lease the owner may not terminate the tenancy of the family for nonpayment of the PHA housing assistance payment.

(c) Criminal activity -

(1) Evicting drug criminals due to drug crime on or near the premises. The lease must provide that drug-related criminal activity engaged in, on or near the premises by any tenant, household member, or guest, or such activity engaged in on the premises by any other person under the tenant's control, is grounds for the owner to terminate tenancy. In addition, the lease must provide that the owner may evict a family when the owner determines that a household member is illegally using a drug or when the owner determines that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents.

(2) Evicting other criminals.

(i) Threat to other residents. The lease must provide that the owner may terminate tenancy for any of the following types of criminal activity by a covered person:

(A) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises);

(B) Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises; or

(C) Any violent criminal activity on or near the premises by a tenant, household member, or guest, or any such activity on the premises by any other person under the tenant's control.

(ii) Fugitive felon or parole violator. The lease must provide that the owner may terminate the tenancy if a tenant is:

(A) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(B) Violating a condition of probation or parole imposed under Federal or State law.

(3) Evidence of criminal activity. The owner may terminate tenancy and evict by judicial action a family for criminal activity by a covered person in accordance with this section if the owner determines that the covered person has engaged in the criminal activity, regardless of whether the covered person has been arrested or convicted for such activity and without satisfying the standard of proof used for a criminal conviction. (See part 5, subpart J, of this title for provisions concerning access to criminal records.)

(d) Other good cause.

(1) "Other good cause" for termination of tenancy by the owner may include, but is not limited to, any of the following examples:

(i) Failure by the family to accept the offer of a new lease or revision;

(ii) A family history of disturbance of neighbors or destruction of property, or of living or housekeeping habits resulting in damage to the unit or premises;

(iii) The owner's desire to use the unit for personal or family use, or for a purpose other than as a residential rental unit; or

(iv) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, or desire to lease the unit at a higher rental).

(2) During the initial lease term, the owner may not terminate the tenancy for "other good cause", unless the owner is terminating the tenancy because of something the family did or failed to do. For example, during this period, the owner may not terminate the tenancy for "other good cause" based on any of the following grounds: failure by the family to accept the offer of a new lease or revision; the owner's desire to use the unit for personal or family use, or for a purpose other than as a residential rental unit; or a business or economic reason for termination of the tenancy (see paragraph (d)(1)(iv) of this section).

(e) Owner notice -

(1) Notice of grounds.

(i) The owner must give the tenant a written notice that specifies the grounds for termination of tenancy during the term of the lease. The tenancy does not terminate before the owner has given this notice, and the notice must be given at or before commencement of the eviction action.

(ii) The notice of grounds may be included in, or may be combined with, any owner eviction notice to the tenant.

(2) Eviction notice.

(i) Owner eviction notice means a notice to vacate, or a complaint or other initial pleading used under State or local law to commence an eviction action.

(ii) The owner must give the PHA a copy of any owner eviction notice to the tenant.

(f) Eviction by court action. The owner may only evict the tenant from the unit by instituting a court action.

(g) Regulations not applicable. 24 CFR part 247 (concerning evictions from certain subsidized and HUD-owned projects) does not apply to a tenancy assisted under this part 982.

(h) Termination of tenancy decisions -

(1) General. If the law and regulation permit the owner to take an action but do not require action to be taken, the owner may take or not take the action in accordance with the owner's standards for eviction. The owner may consider all of the circumstances relevant to a particular eviction case, such as:

(i) The seriousness of the offending action;

(ii) The effect on the community of denial or termination or the failure of the owner to take such action;

(iii) The extent of participation by the leaseholder in the offending action;

(iv) The effect of denial of admission or termination of tenancy on household members not involved in the offending activity;

(v) The demand for assisted housing by families who will adhere to lease responsibilities;

(vi) The extent to which the leaseholder has shown personal responsibility and taken all reasonable steps to prevent or mitigate the offending action;

(vii) The effect of the owner's action on the integrity of the program.

(2) Exclusion of culpable household member. The owner may require a tenant to exclude a household member in order to continue to reside in the assisted unit, where that household member has participated in or been culpable for action or failure to act that warrants termination.

(3) Consideration of rehabilitation. In determining whether to terminate tenancy for illegal use of drugs or alcohol abuse by a household member who is no longer engaged in such behavior, the owner may consider whether such household member is participating in or has successfully completed a supervised drug or alcohol rehabilitation program, or has otherwise been rehabilitated successfully (42 U.S.C.13661). For this purpose, the owner may

require the tenant to submit evidence of the household member's current participation in, or successful completion of, a supervised drug or alcohol rehabilitation program or evidence of otherwise having been rehabilitated successfully.

(4) Nondiscrimination limitation and protection for victims of domestic violence, dating violence, sexual assault, or stalking. The owner's termination of tenancy actions must be consistent with the fair housing and equal opportunity provisions of 24 CFR5.105, and with the provisions for protection of victims of domestic violence, dating violence, sexual assault, or stalking in 24 CFR part 5, subpart L (Protection for Victims of Domestic Violence, Dating Violence, Sexual Assault, or Stalking).

---

**History:** 81 FR 80816, 12/16/2016

**Cite as:** 24 C.F.R. § 982.310

**Note:**

Approved by the Office of Management and Budget under control number 2577-0169

**Source:** 60 FR 34695, July 3, 1995, as amended at 60 FR 45661, Sept. 1, 1995; 64 FR 26645, May 14, 1999; 64 FR 56913, Oct. 21, 1999; 66 FR 28804, May 24, 2001; 73 FR 72344, Nov. 28, 2008; 75 FR 66263, Oct. 27, 2010; 81 FR 80816, Nov. 16, 2016